ARTESIAN WATER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100824.   Promulgated January 22, 1941.

*George G. Witter, Esq.*, for the petitioner.
*E. A. Tonjes, Esq.*, for the respondent.

OPINION.

Black: The petitioner in its return for the taxable year reported gross income of $171,493.42, from which it claimed deductions amounting to $119,805.17, leaving a taxable net income of $54,101.14, upon which it paid the normal income tax for the year.

The petitioner paid no surtax upon its undistributed profits for the year but in its return claimed an exemption from that obligation. It stated its claim for exemption as follows:

Exemption from undistributed profits surtax is claimed on the following grounds: Attention is respectfully directed to Section 14 of the Revenue Act of 1936, part (d) (2) of which reads:

(d) *Exempt from surtax.* The following corporations shall not be subject to the surtax imposed by this Section:

(2) Domestic corporations which for any portion of the taxable year are in bankruptcy under the laws of the United States, or are insolvent and in receivership in any Court of the United States, or of any State, Territory, or the District of Columbia.

The word "insolvent" was apparently used in its dual sense by Congress. The Senate Finance Committee Report on the Revenue Bill of 1936 of June 1, 1936, on page 15, in discussing Section 14 (d) (2), said:

The Finance Committee Bill also avoids the possibility of tax avoidance by collusive receiverships by limiting the provision to cases in which the corporation is in bankruptcy under the Federal bankruptcy laws, and to cases in which it is insolvent, i. e., its liabilities are in excess of its assets or it is unable to pay the claims of creditors as they mature—and in receivership in Federal or State Courts.

The taxpayer was certainly unable to pay the claims of its creditors as they matured. That is, it was unable to pay them in the usual course of business out of quick assets without selling its capital assets. 32 *Corpus Juris* 806 states that the word "insolvency" has two meanings:

In its general and popular meaning, the term denotes the state of one whose entire property and assets, when converted into money without unreasonable haste or sacrifice, are insufficient to pay his debts: But it is frequently used in the more restricted sense to express the inability of a person to pay his debts as they become due in the ordinary course of business.

Creditors claims, referred to above, which the corporation was unable to pay at maturity, consist of balance due the Pacific Mutual Life Insurance Company on account of money borrowed on November 12, 1929, and represented by two notes, one for $35,000 and one for $175,000. The note for $35,000 carried with it a

specific agreement prohibiting the payment of dividends until said note was paid. During 1936 the sum of $26,750 was paid on this note leaving a balance of $8,250 which balance was paid during 1937, whereupon the note and collateral agreement were cancelled.

Similarly, during 1937 payments totaling $74,750 were made on the note for $175,000, making a grand total of payments made of $83,000.

The corporation owns subdivision land and oil producing property. The oil land is under lease to Shell Oil Company. The corporation secured its note to the Pacific Mutual Life Insurance Company by a mortgage on its properties, and gave as collateral security an assignment of the oil lease "together with all rents due, or to become due thereunder." The mortgagee notified Shell Oil Co. of the pledge of the lease and rents and instructed Shell Oil Co. to continue to pay the rents and royalties due under the lease to the corporation until further notice. The note and mortgage became due November 30, 1934, and is still past due. It has not been extended or renewed, and will outlaw November 30, 1938.

The corporation has never been in a position to pay off the mortgage out of current assets. From the foregoing, it is apparent, therefore, the corporation was insolvent and in receivership during the taxable year 1937, and is exempt from the surtax under Section 14.

The respondent in his audit disallowed petitioner's claim for exemption as an insolvent corporation, but, in recognition of its agreement not to declare dividends so long as the $35,000 note remained unpaid, allowed it a credit from the adjusted base in amount of $8,250, under authority of section 26 (c) (1) of the Revenue Act of 1936.[1]

Petitioner, in its brief, states that the points which it relies upon are as follows:

1. The petitioner was in receivership and insolvent in the taxable year.
2. The California codes prohibited the declaration of dividends by the petitioner during the taxable year.

We shall take these points up in their order. As to point 1, it is clear that petitioner was in receivership, but it is also equally clear that this receivership was not occasioned by any insolvency of petitioner. It was due to an altogether different cause. Petitioner concedes that the receivership was not instituted by its creditor, the insurance company, nor was it prolonged by any insistence on the part of the insurance company. Petitioner does contend, however, that in the taxable year 1937 it was insolvent within the meaning of the applicable statute, and that, when the two conditions exist simultaneously, namely, insolvency and receivership, then the exemption provided by section 14 (d) (2) applies. Petitioner, in support of its

---

[1] SEC. 26. CREDITS OF CORPORATIONS.

\* \* \* \* \* \* \*

(c) CONTRACTS RESTRICTING PAYMENT OF DIVIDENDS.—

(1) PROHIBITION ON PAYMENT OF DIVIDENDS.—An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account.

contention that it was insolvent during the taxable year within the meaning of the act, quotes from *Dutcher* v. *Wright*, 94 U. S. 553:

Insolvency, in the sense of the Bankrupt Act, means that the party whose business affairs are in question is unable to pay his debts as they become due, in the ordinary course of his daily transactions; and a creditor may be said to have reasonable cause to believe his debtor to be insolvent when such a state of facts is brought to his notice respecting the affairs and pecuniary condition of his debtor as would lead a prudent man to the conclusion that the debtor is unable to meet his obligations as they mature, in the ordinary course of his business. *Buchanan* v. *Smith*, 16 Wal., 308, 21 L. Ed., 286; *Toof* v. *Martin*, 13 Wal. 1, 40, 20 L. Ed., 481. * * *

That the word "insolvent" as used in section 14 (d) (2) was intended by Congress to carry the meaning used in the above language by the Supreme Court, petitioner contends is evidenced by Senate Finance Committee Report of June 1, 1936, on the Revenue Bill of 1936, where on page 15, in discussing section 14 (d) (2), it is said:

The Finance Committee Bill also avoids the possibility of tax avoidance by collusive Receiverships by limiting the provision to cases in which the corporation is in bankruptcy under the Federal bankruptcy laws, and to cases in which it is insolvent, i. e., its liabilities are in excess of its assets or it is unable to pay the claims of creditors as they mature—and in receivership in Federal or State Courts.

We accept as correct the contention which petitioner makes as to the meaning of the word "insolvent" as used in section 14 (d) (2). We do not think, however, that the evidence shows that petitioner was "insolvent" within the meaning of the act and the foregoing definition at any time during the taxable year. In a balance sheet attached to its income tax return for the taxable year, its total assets are listed at a value of $1,162,789.84; its total liabilities, exclusive of capital stock and surplus, are listed at $144,255.21. It had net income in 1937 of $54,101.14.

While it did not finish paying all of its indebtedness to the insurance company in 1937, it paid $83,000 of it in that year and, as has already been stated, this creditor had nothing whatever to do with instituting the receivership and took no part in prolonging it. Under these circumstances we can not hold that petitioner was an insolvent corporation in receivership during the taxable year. It was not exempt under section 14 (d) (2). On this point we sustain respondent.

As to point 2, raised in petitioner's brief, it is equally clear that the respondent must prevail. The question of whether or not state laws and/or charter provisions of a corporation create contractual relations recognizable in determining Federal income tax questions has been the subject of diverse decisions in different courts, notably in *Northwest Steel Rolling Mills, Inc.* v. *Commissioner*, 110 Fed. (2d) 286, where the Circuit Court of Appeals for the Ninth Circuit sus-

tained the position herein contended for by the petitioner; and in *Crane-Johnson Co.* v. *Commissioner*, 105 Fed. (2d) 740, wherein the Circuit Court of Appeals for the Eighth Circuit held to the opposite view. To settle this conflict in Circuit Court opinions, the Supreme Court granted certiorari in both cases, and in rendering its decisions sustained the Eighth Circuit Court's views in *Crane-Johnson Co.* v. *Commissioner*, 311 U. S. 54, and reversed the Ninth Circuit Court's decision in *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U. S. 46. Following the Supreme Court's decision in these two cases, we sustain respondent as to point 2.

We have disposed of the two points raised by petitioner in its original brief. The petitioner, in its reply brief, has raised a third point which in substance is this: Petitioner had assigned prior to May 1, 1936, as additional security for the payment of its $175,000 note due the insurance company, the oil royalties which it was to receive from the Shell Oil Co., and while this assignment did not expressly limit petitioner in the payment of dividends so long as any of the $175,000 note remained unpaid, nevertheless there was an implied restriction on the payment of dividends imposed by the agreement, and petitioner is entitled thereby to a credit under section 26 (c) (1), *supra*.

There is nothing to show that the assignment of the Shell Co. oil royalties by petitioner to its creditor, the Pacific Mutual Insurance Co., as further security for the payment of its $175,000 note, in any manner expressly restricted petitioner in the payment of dividends. This assignment is not in evidence and we do not know what written provisions it contained, but the witness who testified in regard to it did not say that the assignment dealt "expressly with the payment of dividends." Petitioner does not so contend in its brief. It simply contends that because petitioner had assigned these oil royalties to its creditor, as additional security for the payment of its notes, it was by necessary implication prohibited from the payment of any dividends during the effective period of the assignment. We think this contention must be denied. Cf. *Belle-Vue Manufacturing Co.*, 43 B. T. A. 12.

Petitioner does not make any claim that it is entitled to a credit under the provisions of section 26 (c) (2). On account, however, of the close connection between paragraphs (1) and (2) of section 26 (c) of the Revenue Act of 1936, perhaps we should say a word as to the applicability of section 26 (c) (2) to the facts of the instant case. We have considered the evidence carefully and we find no contract in evidence which would seem to fall within the provisions of section 26 (c) (2).

Our decision in *G. B. R. Oil Corporation*, 40 B. T. A. 738, which was under section 26 (c) (2), is not applicable to the facts in the instant case. In that case the taxpayer, to secure the loans with which to purchase certain oil leases and oil royalties, executed and delivered to the bank from which it was borrowing the money appropriate deeds of trust and also by separate instruments in writing assigned its interests in the properties to the bank in trust and authorized the bank to receive and collect all sums of money derived from the properties and to apply same on its indebtedness to the bank. Under those circumstances, we held that the taxpayer in computing its adjusted net income was entitled to a credit under section 26 (c) (2) of the amount paid on its indebtedness during the taxable year in compliance with the contract.

In the instant case, there was no requirement that the oil royalties received from the Shell Co. should be paid to petitioner's creditor, the insurance company, as there was in *G. B. R. Oil Corporation*, *supra*. On the contrary, the oil royalties were to be paid to petitioner and were in fact paid to it. The insurance company had a mortgage on these oil royalty receipts, it is true, and it is undoubtedly true that a considerable portion of them was used as payments on petitioner's indebtedness to the insurance company, but it seems to us that this falls short of meeting the requirements of section 26 (c) (2). Cf. *Nocona Cotton Seed Oil Co.*, 42 B. T. A. 1172.

For reasons above stated we think the facts in the instant case are distinguishable from those which were present in *G. B. R. Oil Corporation*, *supra*.

*Decision will be entered for respondent.*